No. 96-682

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

CLOVER LEAF DAIRY,
a Montana corporation,

Plaintiff and Appellant,

v.

THE STATE OF MONTANA and THE
MONTANA DEPARTMENT OF HEALTH
AND ENVIRONMENTAL SCIENCES,

Defendants and Respondents.

APPEAL FROM:      District Court of the First Judicial District,
In and for the County of Lewis and Clark,
Honorable Jeffrey M. Sherlock, Judge Presiding.

COUNSEL OF RECORD:

For Appellant:

Brian M. Morris (argued), Goetz, Madden & Dunn, P.C.,
Bozeman, Montana

For Respondents:

Ann Brodsky (argued), Department of Administration,
Helena, Montana

Heard and Submitted:  September 11, 1997

Decided:  November 13, 1997
Filed:

_____
Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Clover Leaf Dairy appeals from the orders of the First Judicial District Court, Lewis and Clark County, granting the Stateþs motions to dismiss and for summary judgment. We affirm.

We restate the issues raised on appeal as follows:

1. Did the District Court err in granting the Stateþs motions for summary judgment?

2. Did the District Court err when it dismissed Clover Leafþs claim for damages based on the Stateþs alleged denial of Clover Leafþs due process rights?

BACKGROUND

In response to consumer complaints, the Montana Department of Health and Environmental Sciences (DHES), now the Montana Department of Public Health and Human Services, examined samples of Clover Leaf milk taken from grocery stores in Helena, Montana. The samples contained an unidentified black substance described as "sludge" or "sediment." On June 3, 1994, DHES embargoed all of Clover Leafþs fluid milk products with a "sell by" date of June 7 or later. The notice of embargo stated:

This is to certify that articles consisting of approximately all Grade A milk and milk products, including whole milk, 2% lowfat milk, 1% lowfat milk, skim milk, 2% lowfat chocolate milk, 2% lowfat acidophilus milk, 1% buttermilk, whipping cream, half & half, and eggnog, packaged in any net weight container including plastic bottles, cartons, and bulk containers  identified with "Sell by" date of June 7 and every "Sell by" day after June 7  . . . in your possession, returned to your possession, or processed/pro-duced/manufactured/or bottled on or after the date of this embargo [are] suspected of being adulterated or contaminated pursuant to õ 50-31-202 or 203, MCA, as follows: the products either have an unknown substance in them which appears as a dark sediment in the product, are suspected to contain this unknown substance, or are contaminated or adulterated or are suspected to be contaminated or adulterated with coliform or other contaminants.

Notice is hereby given of the embargo of the above described foods, and no removal, disposal, sale or movement of said foods, shall be made without permission given under õ 50-31-509, MCA.

To the date of briefing this appeal, the State does not know the identity of the black substance. However, Edward McHugh, owner of Clover Leaf, claimed the substance was the result of protein burn caused during pasteurization and flakes and digestible materials worn from a gasket used during homogenization.

Clover Leaf executed a disposal agreement with the State pursuant to õ 50-31-509(1), MCA. As a result, Clover Leaf destroyed approximately 15,000 gallons of milk.

Clover Leaf filed a timely claim for damages with the Montana Department of Administration based on õ 2-9-301, MCA. The claim was denied.

In February 1995, Clover Leaf and Edward McHugh filed a complaint challenging the June 3 embargo. Count I alleged the State deprived Clover Leaf of its property without due process of law as required by Article II, Section 17 of the Montana

Constitution because the State embargoed Clover Leafþs property without probable cause
to believe that it was adulterated.  Count II alleged that the State violated õõ 50-31-202(1)
and -509(1), MCA, because the State did not have probable cause to believe Clover
Leafþs property was adulterated.  Count III alleged that the actions of DHES were ultra
vires because DHES did not have authority to embargo Clover Leafþs property.

The State moved to dismiss the complaint, and if any counts survived the motion,
to dismiss McHugh as a party.  The District Court denied the Stateþs motion to dismiss
Count II, dismissed Counts I and III, and dismissed McHugh as a party.

The State then moved for summary judgment on Count II, arguing it had probable
cause to believe Clover Leafþs fluid milk products were adulterated when it issued the
June 3 embargo.  On July 19, 1996, the District Court granted the Stateþs first motion
for summary judgment on Count II as it related to Clover Leafþs skim, 2%, and whole
milk.  The court reasoned that a factual question existed as to whether it was reasonable
for the embargo to cover other types of Clover Leaf milk products.

The State filed a second motion for summary judgment on the remaining issues
following the courtþs July 19 order.  The District Court found, based on uncontradicted
evidence, that all of Clover Leafþs milk products were produced from the same raw milk
source and went through the same processing techniques.  The court concluded the State
had probable cause to issue its June 3 embargo against all Clover Leaf milk products and
granted the Stateþs second motion for summary judgment.

Clover Leaf appeals from the District Courtþs orders granting summary judgment
on Count II and dismissing Count I.

DISCUSSION

1.    Did the District Court err in granting the Stateþs motions for summary
judgment?

Summary judgment is proper when the pleadings, depositions, answers to
interrogatories, admissions, and any affidavits on file show that there is no genuine issue
of material fact and that the moving party is entitled to a judgment as a matter of law.
Rule 56(c), M.R.Civ.P.  We review a district courtþs grant of a motion for summary
judgment de novo and apply the same criteria under Rule 56, M.R.Civ.P., as did the
district court.  Minnie v. City of Roundup (1993), 257 Mont. 429, 431, 849 P.2d 212,
214.

A party moving for summary judgment bears the initial burden of establishing the
absence of any genuine issue of material fact and its entitlement to judgment as a matter
of law.  Rule 56(c), M.R.Civ.P.  The nonmoving party has no obligation to establish

that
genuine issues of fact exist until the moving party has shown an absence of such issues
of fact;  unless that initial burden is met by the moving party, the nonmoving party may
rest on its pleading.  Minnie, 849 P.2d at 214.

The Montana Food, Drug, and Cosmetic Act (Montana Act), located at Title 50,
Chapter 31, MCA, regulates the manufacture, production, processing, packing, exposure,
offer, possession, holding, dispensing, giving, supplying or applying, sale, and offer of
sale of food, drugs, devices, or cosmetics.  Section 50-31-102, MCA.  When DHES
issued the June 3 embargo, it relied on õ 50-31-509, MCA, which provides, in relevant part:

Detainer of adulterated or misbranded articles.  (1) If an agent of the
department finds or has probable cause to believe that any food, drug,
device, or cosmetic is adulterated or so misbranded as to be dangerous or
fraudulent within the meaning of this chapter, he shall affix to the article
a tag or other appropriate marking giving notice that the article is or is
suspected of being adulterated or misbranded and has been detained or
embargoed and warning all persons not to remove or dispose of the article
by sale or otherwise until permission for removal or disposal is given by the
agent or the court.  It is unlawful for a person to remove or dispose of a
detained or embargoed article by sale or otherwise without permission.  The
owner of an embargoed article or another authorized person and the
department may enter into a disposal agreement providing for the disposal,
reconditioning, or other disposition of the embargoed article.  If such an
agreement is executed or if the embargo is otherwise removed by the
department or the court, neither the department nor the state may be held
liable for damages caused by such embargo provided that probable cause
existed for its imposition.

Food adulteration is defined at õ 50-31-202, MCA.  According to õ 50-31-202(5),
MCA, food is adulterated if it "consists in whole or in part of a diseased, contaminated,
filthy, putrid, or decomposed substance or if it is otherwise unfit for food[.]"  In
defending its June 3 embargo, the State argued that the black sediment in Clover Leafþs
milk rendered it contaminated, thus making the milk adulterated pursuant to õ 50-31-509,
MCA, and subject to embargo.

The District Court explained in its order granting the Stateþs first motion for
summary judgment that "contamination requires a condition of impurity that results from
the mixture of the milk in question with a foreign substance."  The court reasoned
because it was reviewing a probable cause determination, the State did not have to prove
the exact identity of the black sediment.  The court concluded since it is not usual to have
black sediment of any nature in milk, the State had probable cause to believe the milk
was adulterated or contaminated.

On appeal, Clover Leaf argues the District Court erred by applying a deferential, rather than a de novo, standard of review to the Stateþs probable cause determination. The State responds Clover Leaf raised this issue for the first time on appeal.

We will not consider on appeal a theory not raised at the trial court. Sherrodd, Inc. v. Morrison-Knudsen Co. (1991), 249 Mont. 282, 285, 815 P.2d 1135, 1137.  The record reveals that in Clover Leafþs brief in support of its motion to reconsider the order granting the Stateþs first motion for summary judgment, Clover Leaf did not challenge the courtþs standard of review.  This would normally preclude the issue from being raised on appeal.

However, because we review a district courtþs grant of summary judgment de novo, such a review involves deciding whether the court applied a correct standard of review to its legal conclusions.  Therefore, when reviewing the District Courtþs probable cause analysis, we will consider whether the court erred when it purportedly applied a deferential, rather than a de novo, standard of review to the Stateþs probable cause determination.

Clover Leaf makes three arguments in support of its claim that the District Court erred in granting the Stateþs motions for summary judgment: (1) the court erred when it concluded that DHES had sufficient probable cause to issue the June 3 embargo; (2) the court improperly adopted a criminal probable cause standard to conclude that DHES had sufficient probable cause to embargo Clover Leafþs milk products; and (3) the court ignored genuine issues of material fact regarding the scope of the embargo and the quantity and identity of the black substance in Clover Leafþs milk products.

The State responds that the District Court correctly interpreted the Montana Act and properly held that probable cause existed to support the embargo.  The State maintains that a deferential standard of review of an agencyþs probable cause determination is proper because the same standard is used in the criminal context, and this Court defers to the interpretation given to statutes by agencies charged with their administration.

The State further argues that if this Court agrees the standard of review for the DHES probable cause determination should be de novo, then there is no basis for a reversal because the District Court applied a de novo standard of review to the DHES probable cause determination, and this Court uses its own de novo standard of review for summary judgments.  Finally, the State argues no genuine issues of material fact exist as to the quantity and identity of the black substance in Clover Leafþs milk because regardless of the identity of the black substance, the milk contained a foreign substance,

rendering it contaminated.

    A.      Did DHES have probable cause to issue the June 3 embargo?

    The legal prerequisite for the DHES embargo was a finding of adulteration or probable cause to believe adulteration was present in Clover Leafþs milk products. Section 50-31-509(1), MCA.  In its order granting the Stateþs first motion for summary judgment, the court noted that no Montana court has defined contamination in the context of an embargo case.

    This Court has defined contamination as requiring the presence of a foreign substance.  See Duensing v. Travelerþs Companies (1993), 257 Mont. 376, 381, 849 P.2d 203, 206-07.  We relied on several federal cases to reach this decision.  In Hi-G, Inc. v. St. Paul Fire & Marine Ins. Co. (1st Cir. 1968), 391 F.2d 924, 925, the First Circuit Court of Appeals defined contamination as the introduction of a foreign substance that injures the usefulness of the product.  The Fifth Circuit defined contamination as a condition of impurity resulting from mixture or contact with a foreign substance. American Cas. Co. of Reading, Pa. v. Myrick (5th Cir. 1962), 304 F.2d 179, 183.

      The District Court determined that contamination requires a condition of impurity that results from the mixture of the milk with a foreign substance and concluded that because it is not usual for milk to contain black sediment, the State had probable cause to believe the milk was adulterated or contaminated.

    Clover Leaf argues the court mistakenly defined "contamination" rather than "contaminated substance."  Furthermore, Clover Leaf contends that in order for milk to be contaminated, and thus adulterated, it must be dangerous to human health.  The State responds that Clover Leaf has raised the dangerous argument for the first time on appeal.  We disagree.

    The embargo statute and its application have been the focus of Clover Leafþs case since its complaint was filed.  We therefore address whether the District Court mistakenly defined "contamination," and whether a food must be dangerous to human health before it can be embargoed under õ 50-31-509, MCA.

a.    Did the District Court err when it defined contamination?

    Clover Leaf argues the District Court mistakenly defined "contamination" instead of "contaminated substance."  We reject this argument as illogical and contrary to the intent and a common-sense interpretation of the Montana Act.  It is a well-established rule of statutory construction that a statute is to be read as a whole and construed so as to avoid absurd results. Dover Ranch v.  County of Yellowstone (1980), 187 Mont. 276,

283, 609 P.2d 711, 715.  We hold that the District Court did not err when it defined contamination as a condition of impurity that results from the mixture of the milk with a foreign substance.

b.    Did the District Court improperly remove the dangerous    requirement from its definition of adulteration?

We review a district court's conclusions of law regarding the application of a statute to determine whether the court's interpretation of the law is correct.  State v. Henning (1993), 258 Mont. 488, 490-91, 853 P.2d 1223, 1225.

Clover Leaf argues the court erred in interpreting õ 50-31-509(1), MCA, by concluding the statute contains no requirement that the adulterated food posed a danger to human health.  Clover Leaf contends the term "as to be dangerous or fraudulent" qualifies both "adulterated" and "misbranded."  The State responds that a plain reading of the embargo statute supports the District Courtþs conclusion.

Section 50-31-509(1), MCA, authorizes DHES to embargo food that is "adulterated or so misbranded as to be dangerous or fraudulent[.]"  This Courtþs function in construing and applying statutes is to effect legislative intent.  United States v. Brooks (1995), 270 Mont. 136, 139, 890 P.2d 759, 761.  To determine legislative intent, we first look to the plain meaning of the words used in the statute.  Stansbury v. Lin (1993), 257 Mont. 245, 249, 848 P.2d 509, 511.  If the legislative intent can be determined by the plain language of the words used, this Court may go no further and apply other means of interpretation.  Matter of Kalfell Ranch, Inc. (1994), 269 Mont. 117, 124, 887 P.2d 241, 245-46.

The plain meaning of õ 50-31-509(1), MCA, is clear.  The word "so" qualifies the word "misbranded."  Thus, the statute explains that a food may be embargoed if it is "so misbranded as to be dangerous or fraudulent[.]"  If the statute referred to foods "so adulterated or so misbranded as to be dangerous or fraudulent" or "adulterated or misbranded so as to be dangerous or fraudulent," then Clover Leafþs argument could possibly have merit.  We hold that õ 50-31-509(1), MCA, contains no requirement that adulterated food be adulterated so as to be dangerous or fraudulent in order for it to be embargoed or detained; that the food is adulterated is sufficient under the statute.

B.    Did the District Court err when it purportedly applied a deferential, rather than a de novo, standard of review to the Stateþs probable cause    determination?

When the District Court granted the Stateþs first motion for summary judgment, the court did not expressly state which standard of review it was applying to the DHES probable cause determination.  The court cited State v. Rinehart (1993), 262 Mont. 204,

210, 864 P.2d 1219, 1223, and stated, "The duty of the reviewing court is simply to ensure that DHES, in this case, had a substantial basis for concluding that probable cause for the embargo existed." In Rinehart, we explained that this Court reviews applications for a search warrant to insure that the magistrate or lower court "had a substantial basis for concluding that probable cause to issue the search warrant existed." Rinehart, 864 P.2d at 1223. However, we do not review the magistrateþs determination de novo. Rinehart, 864 P.2d at 1223.

Although the District Court believed it was applying a deferential standard of review to the DHES probable cause determination, there is no evidence the court deferred to the agency. The court independently reviewed the evidence to determine if there was a probability that Clover Leafþs milk products contained a black substance. In so doing, the court reached a correct result. We affirm decisions which are correct regardless of the courtþs reasoning in reaching the decision. Clark v. Eagle Systems, Inc. (1996), 279 Mont. 279, 286, 927 P.2d 995, 999. Despite the courtþs reliance on Rinehart, the standard of review used did not result in error.

C. Did the District Court err when it adopted a criminal standard of review for the DHES probable cause determination?

In its order granting the Stateþs first motion for summary judgment, the District Court noted that no Montana court has interpreted the probable cause requirement contained in Montanaþs embargo statutes. The court, relying on Rinehart, 864 P.2d at 1222, adopted the following definition of probable cause which it applied to review the Stateþs embargo:

Probable cause does not require a prima facie showing of any particular activity. In determining whether probable cause exists, the Court is to consider the totality of the circumstances to see if there is a probability of the existence of the activity in question.

The court concluded by stating "[t]he duty of the reviewing court is simply to ensure that DHES, in this case, had a substantial basis for concluding that probable cause for the embargo existed."

Clover Leaf submits the court erred when it employed the same deferential standard of review used by courts in criminal cases when it reviewed the DHES probable cause determination. This argument fails, however, because even under a de novo standard of review there was probable cause for DHES to issue the embargo.

D. Do genuine issues of material fact preclude the District Court from granting the State summary judgment?

Clover Leaf claims DHES did not present evidence that the black substance was contained in any of its milk products such as sour cream, eggnog, and chocolate milk, or in any of its products with "sell by" dates after June 12, 1994. The record does not support Clover Leafþs argument. In its second motion for summary judgment, the State filed affidavits describing the process Clover Leaf used to make all of its milk products. Clover Leaf had one pasteurizer and one homogenizer. Thus, any of Clover Leafþs milk used the same lines, valves, and pumps as it traveled through the pasteurizer and homogenizer. The affidavits stated that Clover Leaf used the same basic equipment and skim milk base for all of its products, and explained how all Clover Leaf milk products were made by first removing the milk fat from the raw milk. Then, a common base of skim milk was added to various ingredients, such as milk fat, to make the milk products. Clover Leafþs practice was typically to produce more than one type of its milk product on any given day. Clover Leaf presented no evidence to contradict the Stateþs affidavits.

The District Court was presented with uncontradicted facts that all of Clover Leafþs milk products were produced from the same raw milk source, and they all went through the same milk processing techniques. It was reasonable for the court to deduce that the unknown black substance existed in all of Clover Leafþs milk products with the relevant "sell by" dates, including its sour cream, eggnog, and chocolate milk. We conclude the District Court did not ignore genuine issues of material fact concerning the scope of the Stateþs embargo.

Clover Leaf contends that material issues of fact exist regarding the identity of the black substance in its milk products. We disagree. The State presented evidence that Clover Leafþs milk contained a black substance which was visible on the bottom of milk containers. DHES employees visually observed the substance with their naked eyes and microscopically in the Stateþs laboratory. Grocery store customers observed the sediment on the bottom of milk containers.

When the State issued the June 3 embargo, it did not know the identity of the black substance. Regardless of its identity, a black sludge is not something a person expects to find in milk and is therefore a foreign substance. We conclude that any dispute concerning the identity of the black substance does not create a genuine issue of material fact which would preclude the District Court from granting the Stateþs motion for summary judgment.

Next, Clover Leaf argues the court erred and deprived it of a de minimis

defense
to the embargo because the court did not require DHES to quantify the amount of the black substance found in Clover Leafþs milk products.  The State responds de minimis is
inapplicable.

The de minimis exception to enforcement of the federal Food, Drug, and Cosmetic Act (federal Act)  allows a court to overlook small quantities of filth, "especially in
circumstances where no applicable [industry guideline] is in effect and there is no evidence that that quantity found is avoidable through the use of good manufacturing practice, taking into account the state of the industry."  United States v. General Foods
Corp. (N.D.N.Y. 1978), 446 F.Supp. 740, 746.  The exception avoids the harsh effect that would result from strict enforcement of the federal Act, whereby "an expert, armed
with the proper equipment, could detect filth in virtually every food marketed." General
Foods, 446 F.Supp. at 745.

Relying on Ewing v. Mytinger & Casselberry (1950), 339 U.S. 594, 600-01, 70 S.Ct. 870, 873-74, 94 L.Ed. 1088, 1094-95, the State argues that courts do not apply the
de minimis exception under the federal Act to negate the governmentþs probable cause determination because such a determination is not subject to judicial review. Furthermore, the State contends, ample evidence exists in the record that the black substance was present in sufficient quantities so as to prohibit a court from applying the
de minimis exception.

In Ewing, the government seized misbranded food supplements under the federal Act based on an administrative probable cause determination.  A district court held the
seizure violated the Fifth Amendment because the food producer was not afforded a hearing on probable cause.  Ewing, 339 U.S. at 598, 70 S.Ct. at 872.  The United States
Supreme Court reversed, holding the lower court had no jurisdiction to review the administrative determination of probable cause because Congress had not made such a determination under the Act reviewable by the courts.  Ewing, 339 U.S. at 600-01, 70 S.Ct. at 873.

Unlike Congress, in relation to the federal Act, the Montana Legislature has provided for judicial review of the DHES probable cause determination.  Section 50-31-509(1), MCA, gives the State immunity from damages caused by an embargo if the parties execute a disposal agreement and probable cause existed for the embargo. Section
50-31-509(2), MCA, provides if a disposal agreement is not executed, then an agent of DHES must petition a court for an order of condemnation.  If the court finds the embargoed article is adulterated, then the article must be destroyed.  Section 50-31-509(3), MCA.

When õ 50-31-509, MCA, is read as a whole, we conclude the actions of DHES, including its probable cause determination, are reviewable by the courts.  We therefore
reject the Stateþs argument that courts are prohibited from applying the de minimis exception to review the DHES probable cause determination.

We also disagree with Clover Leaf that the de minimis exception applies here. The
black substance was visible to the naked eye of consumers and DHES officials.  It was
described as "black or gray residue," "like soot or like the milk had mud in the
bottom."
When a milk container was shaken, "it became muddy throughout."  The substance was
present in such quantities so as to attract public attention.  We hold the District
Court did
not err in declining to apply the de minimis exception.

The record contains no evidence raising genuine issues of material fact
concerning
the scope of the Stateþs embargo, or the quantity and identity of the substance in
Clover
Leafþs milk products.  The District Court did not err when it granted summary
judgment
to the State on these issues.

The District Court did not err when it determined that the black substance in
Clover Leafþs milk products rendered them contaminated.  Based on this determination,
the milk products were an adulterated food according to õ 50-31-202(5), MCA, and
DHES had probable cause to issue the June 3 embargo.  We hold the court did not err
when it granted the Stateþs motions for summary judgment on Count II.

2.      Did the District Court err when it dismissed Clover Leafþs claim for
damages based on the Stateþs alleged denial of Clover Leafþs due process rights?

Clover Leaf requests this Court to decide whether, in this instance, a party
may
bring a claim for monetary damages based on an alleged deprivation of a
constitutional
right.  Clover Leaf claims it is entitled to monetary damages because the State
deprived
the corporation of its property interest and its right to operate a lawful business
without
having probable cause to believe that the black substance contained in Clover Leafþs
milk
products threatened human health.

This Court may not address moot questions.  Smith v. Electronic Parts, Inc.
(1995)
274 Mont. 252, 258, 907 P.2d 958, 962.  "A moot question is one which existed once
but because of an event or happening, it has ceased to exist and no longer presents
an
actual controversy."  State ex rel. Miller v. Murray (1979), 183 Mont. 499, 503, 600
P.2d 1174, 1176.

Because we have ruled that the State had probable cause to believe that Clover
Leafþs milk products were adulterated, the issue of whether Clover Leaf was
wrongfully
deprived of its property interest and is entitled to damages is moot.

Affirmed.

/S/  J. A.  TURNAGE

We concur:

/S/  WILLIAM E. HUNT, SR.
/S/  JIM REGNIER
/S/  TERRY N. TRIEWEILER
/S/  KENNETH R. NEILL
     District Judge, sitting in place of Justice Karla M. Gray
/S/ RUSSELL C. FAGG
     District Judge, sitting in place of Justice W. William Leaphart
/S/ JOHN W. WHELAN
     District Judge, sitting in place of Justice James C. Nelson